THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CLAYTON WENSTROM *et al.*, Defendants-Appellants.

Second District (1st Division)    Nos. 75-204, 205, 206, 207 cons.

Opinion filed November 4, 1976.

Ralph Ruebner and J. Daniel Stewart, both of State Appellate Defender's Office, of Elgin, for appellants.

William J. Scott, Attorney General, of Chicago, and Philip G. Reinhard, State's Attorney, of Rockford (Raymond McKoski, Assistant Attorney General, of counsel), for the People.

Mr. PRESIDING JUSTICE GUILD delivered the opinion of the court:

The four defendants herein, all deputy sheriffs for the County of Winnebago, were jointly indicted for misconduct in that they knowingly exerted unauthorized control over the money of one William W. McClain. In a bench trial they were found guilty and each placed on probation for a period of three years. They appeal.

Defendants, in actuality, have raised the following two contentions as to why the conviction should be reversed, to-wit, first, that the trial court erred in denying the motion to dismiss the indictment as the statute of limitations had run and that the trial court erred in denying the motion for a directed verdict because the State had failed to prove the extended limitations allegations in the indictment; and, secondly, that the confession of each defendant was obtained under coercive circumstances in that the *Miranda* warnings were not given to one defendant and were incompletely stated to the other three defendants as they were not advised of their right to appointive counsel in the event of their indigency.

The facts of this case are as follows. On April 3, 1970, one William McClain, in an automobile chase, was apprehended by Deputy Miller and Deputy Peterson. At the trial McClain testified that at the time of his apprehension he had $482 on his person which was taken from him when he was booked in the sheriff's department. He further testified that an envelope containing $390 had been placed above the sun visor on the driver's side of the motor vehicle in which he was riding. He further testified that the $390 was never returned to him. The defendants were indicted for official misconduct on July 10, 1974, for the taking of the $390. The indictment alleged the knowing exertion of unauthorized control over the money on the 3rd of April, 1970. The indictment further stated the prosecution for the offense, based upon the misconduct of the four deputy sheriffs, was commenced on June 25, 1974, within one year after the discovery of the offense by a person having a legal duty to report such offense and that the State's Attorney became aware of the offense in question on April 11, 1974.

On April 11, 1974, it appears that the Attorney General of Illinois was cooperating with the sheriff of Winnebago County in an internal investigation of the sheriff's office. On that date Deputy Holcomb advised the investigating officers in the internal investigation of the sheriff's office

that he had become aware of the taking of the money on April 4, 1970, but that he didn't tell anyone about it. On that date four officers of the Winnebago County sheriff's office, to-wit, Brown, McMahon, Coots and England, interviewed the four defendants separately in the sheriff's office. All four defendants admitted that $390 had been found in the car in question and the money was divided among them. Deputy Miller received $120, Deputy Peterson $120, Sergeant Wenstrom $120 and Deputy Betts $20, although Deputy Betts stated that he received $10.

The confessions of Miller, Betts and Peterson were reduced to writing and signed by them. Wenstrom's confession was reduced to writing but he refused to sign the same. The four officers in question were apparently relieved of duty and were not arrested until the time of their indictment some two months later.

On December 19, 1974, a hearing was had before Judge William R. Nash for the suppression of the confessions of the defendants. The motions were denied. Subsequently, the defendants were tried before Judge Nash in a bench trial and were found guilty and placed on probation for a period of three years.

At the trial Holcomb testified substantially as he had at the motion to suppress, although counsel for the defendants offered to stipulate his testimony at the trial would be the same as introduced in the motion to suppress. Holcomb testified he had been at the scene of the arrest of McClain and that on the next day he discussed the discrepancy in the amount of money recovered with Deputy Betts while they were on duty. Holcomb was advised by Betts that he couldn't tell him about it but that Betts had received $10-20 and that deputies Miller, Peterson and Wenstrom had split up the money. On the same day, about 8 in the evening, Holcomb went to the Svithoid Park in Rockford, Illinois, with Betts in the squadcar. Deputies Miller and Peterson were also at Svithoid Park. A discussion was had about the money. One of the deputies asked Holcomb if he were going to tell on them and Peterson stated, "You'd better not or we'll kill you." Betts then shot his gun off from behind Holcomb. Holcomb testified that either Miller or Peterson said that they thought it best not to tell Wenstrom that Holcomb was aware of the situation. Again counsel for the defense offered to stipulate that the testimony of Officer Coots would be the same as at the motion to suppress, however, the counsel for the State had Officer Coots testify. Officer Coots then testified as to the statements made by the four deputies in his presence. Officer Brown was then called as a witness to the confessions and it was stipulated by counsel for the defendants and the State that the testimony of Officer Brown would be the same as it was at the motion to suppress.

We turn to the first contention of the defendants that the court erred in

denying a motion to dismiss the indictment because the statute of limitations had run. The offense herein occurred on April 3, 1970. Under the provisions of the then official misconduct statute this offense was a misdemeanor (Ill. Rev. Stat. 1969, ch. 38, par. 33—3). The prosecution was brought under the extended limitations section of the Criminal Code for acts of misconduct in office by a public employee. (Ill. Rev. Stat. 1973, ch. 38, par. 3—6(b).) The statute of limitations for a misdemeanor is 18 months and may be extended for a three-year period. Section 3—6(b) further required, notwithstanding the extension of the statute of limitations for prosecution, the offense must be prosecuted within one year from the date of the discovery thereof. Pursuant to the extension statute, the indictment alleged that prosecution was commenced on "June 25, 1974 within one year after discovery of the offense by a person having a legal duty to report such offense, and in the absence of such discovery within one year after the proper prosecuting officer * * * became aware of the offense, which was not before April 11, 1974." The State's Attorney became aware of the offense in 1974 after Deputy Holcomb reported it during the internal investigation of the sheriff's office. Defendants contend that Deputy Holcomb was "a person having a legal duty to report such offense" under the provisions of section 3—6(b) of the Criminal Code and that the extended limitations period began to run on that date, to-wit, April 4, 1970, not in 1974 when the prosecutor was advised of the offense. In support of this contention the defendants have cited *People v. McGreal* (1971), 4 Ill. App. 3d 312, 278 N.E.2d 504. In attempting to distinguish *McGreal* from the present case defendants contend that Deputy Holcomb was a subordinate who had been delegated the legal duty to report an offense of this type. In *McGreal* the court held that the assistant commissioner of the Building Department of the City of Chicago had not been delegated the legal duty to report offenses of misconduct and that, therefore, the extended period of the statute of limitations applied. The court in *McGreal*, in interpreting section 3—6(b) of the Criminal Code, stated that the legislature meant the person in charge, that is, the head of the department, division or governmental agency. The court held that if a subordinate of such a person, who in that case was the assistant commissioner of the Building Department, discovered misconduct in office so as to trigger the running of the one-year extended period, there must be evidence that the subordinate was delegated the duty to report the offense to the proper prosecuting authority. The question thus presented to us in this case is whether or not the duty to report an offense of misconduct was delegated to Deputy Holcomb.

The trial court, at the hearing on the motion to suppress the confessions, found that Deputy Holcomb had discovered the offense and had a duty to report it; however, the court stated:

"Every deputy sheriff has a duty to report all criminal offenses which come to his attention; the statute and the rules of the sheriff's department are clear in this regard. In this case, however, the deputy who discovered the offense was influenced by the defendants in such a way as to preclude them from taking advantage of his failure to report the offense for some four years thereafter.

The defendants cannot now be permitted to be the beneficiaries of their own misconduct in causing this deputy to breach his duty, particularly in view of the fact that one of the defendants was his immediate superior in the department, the person to whom he would have normally reported and in a position to exercise control over him.

To permit the triggering of the extended limitation period under these circumstances would be little different than to do so because each of the defendants, themselves, had the same duty to report the offense. The general assembly did not intend such a result in adopting this legislation."

The State argues that Deputy Holcomb was not "a person having a legal duty to report" under the provisions of section 3—6(b). In support of this argument the State contends that the legislature intended to limit the word "person" to those public officials charged with responsibilities for their subordinates and that it was not the duty of Deputy Holcomb to report the misconduct to the State's Attorney but that normal procedure dictated that the deputy report such an offense to his superior officer who, in this case, would have been Sergeant Wenstrom, one of the defendants who received the money. The State further contends that the extended statute of limitations did not begin to run until the offense was discovered by the Sheriff himself. Under the peculiar facts of this case it is inconceivable to us that the legislature ever intended, in enacting the pertinent legislation herein, that in a case of official misconduct as here, a discovery by a fellow deputy sheriff of an offense by another deputy would constitute "discovery of the offense by a person having a legal duty to report such offense." To hold that the four officers herein could not be prosecuted for taking the money because another officer discovered the same and therefore the extended period of limitations had run, would be a gross miscarriage of justice.

■■ It can thus be seen that the four defendants are relying upon the commission of a criminal offense on the part of Deputy Holcomb, to-wit, his failure to report the offense, as a basis for claiming that the prosecution was barred under both the original statute of limitations and the statute extending the same. Whether Deputy Holcomb failed to report the offense because of intimidation by the four officers, or because of

friendship, it is obvious to this court that such a construction of the extended limitation period would be unconscionable. It is true, as defendants state in quoting from *Taylor v. State* (1931), 44 Ga. App. 64, 160 S.E. 667, *cert. denied* (1932), 175 Ga. 642, 165 S.E. 733, one must weigh the competing interests between preserving the statute of limitations and the right of the individual to have a fair trial. However, the statutes of limitations as to the time within which crimes must be prosecuted are creatures of the legislature. Adopting the argument of the defendants that it was the duty of Deputy Holcomb to report the offense, we would have the statute not being tolled based upon the commission of an offense by a fellow deputy. Section 31—5 of the Criminal Code (Ill. Rev. Stat. 1973, ch. 38, par. 31—5) placed Deputy Holcomb in the same category with the defendants. This statute is the old accessory-after-the-fact offense found in the pertinent prior statute (Ill. Rev. Stat. 1959, ch. 38, par. 584). As such, he could have been joined in the indictment and tried together with the other four defendants. We, therefore, find that the extended statute of limitations was not barred by the fact that Deputy Holcomb discovered the offense and failed to report the same.

■■■ Defendant made the related contention that at the trial the State had to prove the extended statute of limitations was applicable. It is well settled that the State must plead and prove in its indictment that the extended statute of limitations applies to the factual situation at hand. (*People v. Munoz* (1974), 23 Ill. App. 3d 306, 319 N.E.2d 98.) In the present case the indictment alleged sufficient facts upon which the extended statute could be based. At the pretrial hearing to dismiss the indictment and again at the trial the State introduced sufficient evidence, summarized above, upon which the trial court could find that the extended statute of limitations applied. In light of our previous discussion about the application of the extended statute of limitations, we find this point is without merit. Furthermore, in *People v. Dixon* (1970), 46 Ill. 2d 502, 263 N.E.2d 876, the Illinois Supreme Court noted that it would be presumed that where the case was tried before a court without a jury that the court took judicial notice of its own record. In the case at hand the defendants were tried in a bench trial before the same judge who heard the motion to dismiss the indictment. At the hearing on that motion the court found that the extended statute of limitations applied. Thus, that judge is presumed to know the ruling that occurred in the pretrial hearing and the requirements of *Munoz* are met.

We next turn to the defendants' two-fold contention that the motions to suppress the statements of the defendants should have been granted because they were obtained under coercive circumstances and, secondly, that the *Miranda* warnings were incompletely given to three of the

defendants and not given to Miller, the first defendant interviewed. We find this to be without merit.

As indicated above, the Attorney General's office was making an internal investigation of the Winnebago County sheriff's office. The first officer who was called in before the four investigating deputy sheriffs was Deputy Holcomb, who advised the investigating officers for the first time of his knowledge of the taking and the dividing of McClain's money among the four officers. The investigating officers then called in Deputy Miller over the police radio. He was not given any *Miranda* warnings nor threatened with dismissal. The officer merely inquired of him if he knew anything about what had supposedly transpired. He not only made a statement within 15 minutes about the offense in question, he personally typed it up and signed it. After the statement from Miller, Deputy Peterson, who was upstairs, was called down and, as Deputy Peterson testified, Officer England advised him about his rights. "He started with the rights. He started advising me of my rights and I told him, 'Yes, Yes, I knew what they were,' and he didn't get down to the last one is all." Deputy Betts also testified that he was called into the chief of detectives' room at the Winnebago County sheriff's office where he was questioned by Detectives Brown, Coots and England. Betts testified that Detective England started to say, "Ron, you know you have your rights and you don't have to talk to us," and I said, "Well, have the rest of the guys, if they talked to you, given you written statements," and he said, "Yes, they have," and I said, "Well, Okay, I'll cooperate, too." He further testified that Detective England advised him about the statement by "Steve [Holcomb]" and that Holcomb was almost in tears when he finally broke down and told the investigating officers what had happened. Sergeant Wenstrom was the last of the four defendants questioned by the investigating officers. Wenstrom testified that Detective England said, "I'll have to advise you of your rights, Clayt," and he replied, "Yes, I know." At the conclusion of the conversation with the investigating officers, Detective Brown, in response to Wenstrom's inquiry, stated that "Well, hopefully it will be a merit commission and not a court hearing." Sergeant Wenstrom further testified that he had memorized the *Miranda* warnings. The other three officers stated that they carried with them the *Miranda* warnings on a card and were familiar with them and had used them in questioning suspects. We thus have the unique situation with the four defendants herein, all police officers, three of whom carried the *Miranda* warning cards with them at all times, and the fourth who had memorized the same. Furthermore, at no time were any of the defendants threatened with dismissal if they exercised their fifth amendment rights to remain silent.

The four officers were not in custody and their respective interrogations were noncustodial. As a matter of fact, they were not charged with the offense until two months later. The defendants argue, however, that the officers herein not only should have been given the *Miranda* warnings but should have specifically been advised that exercise of their right to remain silent would not be grounds for dismissal. In support of this contention defendants cite *Garrity v. New Jersey* (1967), 385 U.S. 493, 17 L. Ed. 2d 562, 87 S. Ct. 616, and *Spevack v. Klein* (1967), 385 U.S. 511, 17 L. Ed. 2d 574, 87 S. Ct. 625, as well as *Confederation of Police v. Conlisk* (7th Cir. 1973), 489 F.2d 891. The Supreme Court stated in *Miranda* that the issue decided therein was:

> "The constitutional issue we decide in each of these cases is the admissibility of statements obtained from a defendant questioned while in custody or otherwise deprived of his freedom of action in any significant way. * * * They all thus share salient features— incommunicado interrogation of individuals in a police-dominated atmosphere, resulting in self-incriminating statements without full warnings of constitutional rights." (*Miranda v. Arizona* (1966), 384 U.S. 436, 445, 16 L. Ed. 2d 694, 707, 86 S. Ct. 1602, 1613.)

*Garrity* and *Spevack* were reviewed by the Supreme Court under constitutional safeguards and not under the requirements of *Miranda*. In *Garrity* certain police officers were questioned about the fixing of traffic tickets. The officers were warned that any statement they made would be used against them, that they had the privilege to refuse to answer if the disclosure would tend to incriminate them and if they refused to answer they would be subject to removal from office. The statute in New Jersey in the *Garrity* case provided that if an officer refused to testify upon matters relating to his office he would be removed. The Supreme Court held under these circumstances that the defendants were, in fact, coerced into making the incriminating statements. The court stated that the choice given to the defendant officers was to either incriminate themselves or lose their jobs. The court held that under the protection of the fourteenth amendment against coerced statements, the statements obtained under threat of removal from office may not be used in subsequent criminal proceedings. In *Spevack* the petitioner, an attorney, refused to produce documents which he stated would incriminate him. The issue presented dealt with the petitioner's disbarment for failure to produce the alleged incriminating documents. The court held the self-incrimination clause of the fifth amendment, which applies to the States through the fourteenth amendment, extends its protection to lawyers, forbidding the imposition of the sanction of disbarment as a penalty for remaining silent.

In *Conlisk* the court was asked to determine the constitutionality of the Chicago Police Department's action in suspending or discharging six

police officers. The six officers were called before a Federal grand jury investigating alleged corruption in the police department involving "ticket fixing." The officers refused to testify on the grounds that their answers might tend to incriminate them in violation of their fifth amendment rights against self-incrimination. At no time, either at the grand jury or the internal affairs division hearing resulting in their suspension or discharge, were the police officers informed that any information which they might give would not be used against them in a criminal proceeding, nor were they advised that such testimony would result in their suspension or discharge. The court held, in revoking the suspensions and discharges of the officers, that the police department rule which denied to the officers their privilege against self-incrimination was constitutionally invalid. The court further stated that a public employer might discharge an employee who refuses to answer specific questions relating to the employee's duties if the employer advises the employee that his refusal to answer will result in his dismissal, but that such answers would not be used against him in a criminal proceeding.

■■ We find that these cases are distinguishable from the case before us. In all three cases the courts therein held that the parties concerned could not be forced to waive their fifth amendment right. Herein, we do not find any threat of dismissal nor any coercion. The defendants voluntarily waived their privilege against self-incrimination.

■■ Under the facts outlined above, it can hardly be stated that the police officers, all familiar with the *Miranda* warnings, were in police custody or deprived of their freedom of action in any significant way within the meaning of *Miranda*. When the investigation started on the day in question, the investigating officers apparently did not know that a crime had been committed. The first defendant questioned was Deputy Miller, who volunteered the information that he had, in fact, shared in the money taken from the witness, McClain. Following that, the investigating officers attempted to give the *Miranda* warnings, but each of the three defendants stated that they were familiar with them. The purpose of giving the *Miranda* warnings is to advise a suspect, either in custody or otherwise deprived of his freedom, of his rights. We do not feel that *Miranda* requires a rote or ritual reading of the *Miranda* warnings to police officers who know and have used these warnings in questioning suspects. The fact that they were not in custody or deprived of their freedom is further emphasized by defense counsel's argument that the facts herein indicated and created the appearance of a departmental investigation, not a criminal interrogation. Nonetheless, defendants argue that their statements should be suppressed because they were the result of custodial interrogation. In support of this contention they have cited *United States v. Oliver* (7th Cir. 1974), 505 F.2d 301. That case has been

overruled indirectly by the recent decision in *Beckwith v. United States* (1975), 425 U.S. 341, 48 L. Ed. 2d 1, 96 S. Ct. 1612. In *Beckwith* the Supreme Court held that where the Internal Revenue Service was interviewing the defendant in a private home and in his place of employment, that the same was noncustodial, even though the defendant was the focus of a possible criminal investigation. In our recent case of *People v. Snow* (1976), 39 Ill. App. 3d 887, 350 N.E.2d 875, we discussed in great detail *Beckwith* and other cases dealing with the factors that should be considered to determine whether a particular interrogation is custodial or not. In *Snow* we pointed out that *Miranda* does not automatically apply just because an individual is the focus of a criminal investigation. We said that when the individual voluntarily submits to questioning at his place of business, at a reasonable hour and for a reasonable time period by people he knows and when he is neither placed under arrest nor deprived of his freedom of action in any significant way, there can be no threat of compulsion or danger of intimidation. Under such circumstances, it is a noncustodial interrogation and *Miranda* is inapplicable. We also find that to be true in the case before us.

Defendants further argue that they were not informed of their right to appointed counsel. This argument is answered by the above where we have indicated that all four defendants were fully conversant with all of the provisions of the *Miranda* warnings. In any event, in *Commonwealth v. Wilbur* (1967), 353 Mass. 376, 231 N.E.2d 919, the Supreme Court of Massachusetts was confronted with the question of whether to suppress defendant's statement when the interrogating officer, in giving the *Miranda* warnings, had failed to advise defendant that if he could not afford an attorney one would be appointed for him. The court observed that the defendant was a law enforcement officer who had the authority of a police officer and found no error as the defendant could not be considered ignorant of the rights of a person under arrest.

In summation, therefore, we find that the court did not err in denying defendants' motions to dismiss the indictment and for a directed verdict. The extended statute of limitations was properly applied to this factual setting. We also find that the trial court did not err in denying the defendants' motion to suppress their confessions. The defendants' rights were not violated by the procedure followed by the law enforcement officers in this case.

Judgment affirmed.

SEIDENFELD and HALLETT, JJ., concur.